**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **JERRY WAYNE TAYLOR**, | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 2:03-CV-2589 |
| **UNITED STATES OF AMERICA,** | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

## I. INTRODUCTION

Plaintiff Jerry Wayne Taylor brought a case pursuant to the Federal Torts Claim Act (FTCA), 28 U.S.C. § 2680(h), against Defendant United States of America. Plaintiff alleges that Defendant, by and through agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF), committed assault and battery, intentional infliction of emotional distress (IIED), and negligence. Further, Plaintiff seeks damages for pain and suffering, past and future medical expenses, loss of income, and costs and expenses of litigation. The Court conducted a non-jury trial on September 25-26, 2006 on the merits of this case. After consideration of the testimony of the witnesses, the exhibits, and the briefs of the parties, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

1. At the time of the trial, Plaintiff was a forty-eight year-old male with a General Equivalency Diploma. (Tr. 86, 89.)

2. The ATF is a division of the Department of Justice and thus, an agency of the United States.

1

(Pl.'s Proposed Findings of Fact and Conclusions of Law 2.)

3. The Hot Springs, Arkansas Organized Crime Drug Enforcement Task Force (OCDETF) conducted a sting operation referred to as Operation Moonshine 2000. (Tr. 233, 337-38.) The ATF, Hot Springs Police Department, Arkansas State Police, and Garland County Sheriff's Department participated in the operation (Tr. 337.)

4. ATF Agent John Carlton (Carlton), the Case Agent for the operation, provided guidance to participants in the operation, completed paperwork, and worked with the U.S. Attorney's and/or district attorney's offices. (Tr. 338, 377, 380-81.)

5. Lieutenant Rick Norris (Norris), Hot Springs Police Department, served as the supervisor and coordinator of the operation. (Tr. 258, 379.)

6. Carlton testified that during the course of the operation's investigation, Plaintiff's name came up as well as his reputation as a person who had some capacity for violence. (Tr. 381.)

7. Plaintiff's nephew, Tyrone Jones (Jones), was the target of the take down planned for October 13, 2000. (Tr. 21, 381.)

8. On October 13, 2000, Plaintiff was a passenger in an automobile driven by Jones in Hot Springs, Arkansas. (Joint Pretrial Order, Uncontested Facts; Tr. 99.)

9. On October 13, 2000, OCDETF set up a surveillance of a Captain D's restaurant in Hot Springs, Arkansas, in anticipation of an undercover drug transaction between Jones, a target of the investigation, and a cooperating informant. (Tr. 233-36, 258-59, 339-44.)

10. ATF Agent Warren Newman (Newman) was present, acting in his capacity as a federal law enforcement officer. (Joint Pretrial Order, Uncontested Facts.)

11. Carlton and Newman both worked in the ATF Little Rock Field Office and occasionally

worked on cases together. (Tr. 331, 334-35.) However, they were never "partnered" in the formal sense. (Tr. 335.)

12. During the October 13, 2000 operation, Newman assisted Carlton and was a member of the take down team. (Tr. 233-34, 338.)

13. Carlton, Norris, Investigator Brian Keck (Keck), Hot Springs Police Department, Scotty Dodd, investigator with the Arkansas State Crime Division, and other law enforcement personnel were also present during the operation. (Tr. 234-35, 255, 257-58, 297-98, 337, 340.)

14. Officers and agents observed a vehicle driven by Jones pull into the Captain D's restaurant. (Tr. 259, 341.) A second individual in the vehicle was identified as Plaintiff. (Tr. 259, 341, 382.)

15. Officers and agents listened to the conversation between Jones and the informant through a wire worn by the informant. (Tr. 236.) They observed a drug transaction between Jones and the informant. (Tr. 258-59, 341.) The informant purchased narcotics from Jones with agent cashier funds supplied by Carlton. (Tr. 339, 341-42.)

16. All the officers and agents involved in the operation could communicate and monitor each other's comments over task force radio. (Tr. 382.)

17. Shortly after Plaintiff and Jones left the restaurant, they were arrested at the corner of Linwood and Greenwood in Hot Springs, Arkansas for unlawful possession of a controlled substance with intent to sell. (Joint Pretrial Order, Uncontested Facts; Tr. 93, 99-100, 271.)

18. Law enforcement officers assigned to the OCDETF, including Carlton acting in his capacity as a federal law enforcement officer, stopped Jones' vehicle. (Joint Pretrial Order,

3

Uncontested Facts.)

19. When Jones and Plaintiff were placed under arrest, neither was armed nor attempted to flee. (Joint Pretrial Order, Uncontested Facts.)

20. Newman removed Plaintiff from the automobile and arrested him. (Tr. 215-16, 219, 348.)

21. Newman testified that although Plaintiff was not combative, he was resistant. (Tr. 216.)

22. During the course of his arrest, Plaintiff's hands were handcuffed behind his back and he was required to lie face down in the grass near the edge of the road. (Joint Pretrial Order, Uncontested Facts.)

23. Plaintiff testified that during his arrest, Newman threw him to the ground and handcuffed him. (Tr. 100.) Newman then dropped down forcefully on Plaintiff's back with his knee. (Tr. 100-01; see also Tr. 32.) Plaintiff also testified that Newman threatened him and hit him with a pistol. (Tr. 101.) Plaintiff stated he felt a sharp pain and heard something pop when Newman's knee hit his back. (Tr. 101-02.) Further, Plaintiff also stated that he made complaints about his back injury at the scene. (Tr. 25, 101.)

24. In contrast, Newman testified that he did not land on Plaintiff's back with his knee nor strike Plaintiff with a pistol. (Tr. 226.)

25. Further, Newman testified that he has never used excessive force during his law enforcement career and has never been suspended, reprimanded, or otherwise disciplined for using unreasonable or unnecessary force. (Tr. 232-33.)

26. Newman and Scotty Dodd testified that Plaintiff never complained about or indicated that he was experiencing pain at the scene. (Tr. 226, 261.)

27. Carlton testified that after law enforcement personnel stopped Jones's car, he commanded

4

Jones to get out of the vehicle and to get down on the ground. (Tr. 347.) Jones complied and Carlton handcuffed and patted him down for weapons. (Tr. 347-48.) While another officer watched Jones, Carlton went around the rear of the car to the passenger side. (Tr. 348.) There, Carlton observed Plaintiff with his hands behind his back and Newman handcuffing or finishing handcuffing Plaintiff. (Tr. 348-49.) Carlton also testified that at the time, Newman had his gun holstered. (Tr. 349.) In addition, Carlton did not observe anyone place a knee on Plaintiff's back or threaten him. (Tr. 349-50.)

28. Scotty Dodd testified that when he arrived, Taylor was already handcuffed and he did not observe anyone hit or knee Plaintiff in the back. (Tr. 259-60.)

29. Keck testified that he saw Newman remove Plaintiff from the car and place him on the ground. (Tr. 299.) Keck also testified he did not see anyone hit or knee Plaintiff and that Newman's gun was holstered. (Tr. 299-300.)

30. Keck testified as to the technique for applying handcuffs on an individual who is on the ground. (Tr. 306.) Keck stated that if there is an individual on the ground, the law enforcement officer would kneel behind or beside the individual to apply the handcuffs. (Tr. 306.) Keck further testified that he could not remember an occasion where an arresting officer's knee was in contact with the person being restrained. (Tr. 309.)

31. After Newman handcuffed and arrested Plaintiff, Newman handed Plaintiff over to another officer. (Tr. 227.)

32. Plaintiff admitted he had a felony criminal record and that at the time of his arrest, he was a Crips gang member. (Tr. 139-41.)

33. Following his arrest, Plaintiff was transported to the Garland County Detention Center

5

(GCDC) in Hot Springs, Arkansas. (Joint Pretrial Order, Uncontested Facts.)

34. Carl Lacey (Lacey), GCDC Jail Administrator, testified from GCDC records regarding Plaintiff's October 2000 incarceration and testified that Plaintiff did not complain of back pain. (Tr. 281-82.)

35. Plaintiff was booked-in on October 13, 2000 and Deputy Nick Dodd filled out an Officer-Inmate Questionnaire form. (Tr. 282, 286, 312-16.)

36. The Officer-Inmate Questionnaire is a standard part of the inmate book-in process. (Tr. 282.) In filling out the form, the detention officer asks the inmate a series of questions about the inmate's health condition and health status. (Tr. 282.) The officer also records his or her observations of the inmate. (Tr. 282.)

37. Plaintiff's October 13, 2000 form is not dated, but was filed with other information related to Plaintiff's October 13, 2000 book-in. (Tr. 286; Ex. 6, 7.)

38. The only difference between Exhibits 6 and 7 is that Exhibit 6 is a copy of the October 13, 2000 questionnaire that Dodd initialed and dated when ATF agents interviewed him in December 2002. (Tr. 319-20; Ex. 6, 7.)

39. The Officer-Inmate Questionnaire form filled out and signed by Plaintiff and Nick Dodd on October 13, 2000 does not reflect any medical complaints. (Tr. 282, 313-16; Ex. 6, 7.) Plaintiff did not tell Nick Dodd of any medical problems or mistreatment. (Tr. 314-16.) Moreover, Nick Dodd's physical examination of Plaintiff did not reveal any observable injuries. (Tr. 314-15.)

40. Nick Dodd began working at the GCDC on September 27, 2000. (Tr. 311.)

41. Plaintiff had a prior Officer-Inmate Questionnaire on file dated July 8, 2000 (Tr. 286-87; Ex.

6

19.)

42. Nick Dodd did not sign this prior questionnaire. (Tr. 316; Ex. 19.) Further, Nick Dodd testified he did not look at this document anytime in connection with Plaintiff's October 13, 2000 book-in. (Tr. 316; Ex. 19.)

43. The July 8, 2000 questionnaire and the October 13, 2000 questionnaire do not contain the exact same information. (Ex. 6, 7, 19.)

44. In contrast to Nick Dodd's testimony and the information on the questionnaires discussed above, Plaintiff testified that after his arrival at the GCDC, his requests for medical attention were ignored. (Tr. 102-104, 148-49; <u>see also</u> Tr. 30.) Further, Plaintiff testified that GCDC did not have medical complaint forms. (Tr. 149.)

45. Plaintiff also testified that Nick Dodd filled out his October 13, 2000 questionnaire based on information from his July 8, 2000 questionnaire. (Tr. 150-51.)

46. After Jones's arrest, he plead guilty to aiding and abetting in possession of cocaine. (Tr. 30.)

47. After Plaintiff's arrest, a federal grand jury in the Eastern District of Arkansas indicted him on federal drug-trafficking charges. (Joint Pretrial Order, Uncontested Facts.)

48. In connection with these charges, Plaintiff was first represented by Bruce Eddy (Eddy), Assistant Federal Public Defender. (Tr. 170; Ex. 15.)

49. Plaintiff did not tell Eddy that an officer kneed him in the back or otherwise injured him during his October 13, 2000 arrest. (Tr. 172.)

50. On October 17, 2000, Plaintiff had an initial appearance before a magistrate judge where an Assistant United States Attorney (AUSA) was present. (Tr. 171-72; Ex. 15.) On October 25, 2000, Plaintiff had a detention hearing before a magistrate judge. (Tr. 178; Ex. 15.) On

neither occasion did Plaintiff inform the Magistrate Judge or AUSA about an officer kneeing him in the back or a denial of medical attention. (Tr. 171-72, 178.)

51. On October 25, 2000, Carlton met with and interviewed Plaintiff at the GCDC. (Tr. 351-52.) Norris and Scotty Dodd were also present. (Tr. 261, 352.)

52. During the October 25, 2000 interview, Plaintiff was advised of his rights, signed a written waiver in the presence of others, and gave a detailed statement related to the alleged criminal activities. (Tr. 173-75, 261-62, 351-52; Ex. 16, 17.)

53. During the October 25, 2000 interview, Plaintiff did not complain of any pain. (Tr. 262-63.)

54. Eddy represented Plaintiff during the interview and gave the officers permission to interview Plaintiff. (Tr. 353.)

55. Eddy represented Plaintiff on the criminal case up through November 2, 2000. (Tr. 175-76; Ex. 15.)

56. After Eddy stopped representing Plaintiff, Attorney Alan LeVar (LeVar) was appointed. (Tr. 177; Ex. 15.) LeVar represented Plaintiff until November 30, 2000. (Ex. 15.)

57. Plaintiff also did not tell LeVar about his injuries. (Tr. 177-78.)

58. Plaintiff testified he did not have a chance to discuss his back pain with Eddy or LeVar. (Tr. 114-15.)

59. On November 7, 2000, emergency room physician Dr. Evelyn Young (Young) treated Plaintiff in National Park Medical Center's emergency room. (Young Dep. 37-38; Ex.14.)

60. Young testified from medical records generated by herself and other medical personnel during Plaintiff's emergency room treatment. (Young Dep. 38, 44-45, 60-61; Ex. 14.)

61. Plaintiff arrived at the emergency room by wheelchair accompanied by a law enforcement

officer at 4:30 a.m. (Young Dep. 44, 75-76; Ex. 14.)

62. Young testified that Plaintiff complained of a sudden onset of lower back pain while sitting playing cards the prior evening. (Young Dep. 46, 56, 88; Ex. 14; see also Tr. 167-68.) Specifically, Young testified that according to her notes, Plaintiff told her he had an onset of low back pain the prior evening– "last p.m. while sitting playing cards, unable to stand up straight, radiates down legs with numbness to the left leg." (Young Dep. 56; Ex. 14.)

63. Young testified that the "onset" of pain refers to the pain a patient is having that moment. (Young Dep. 104.)

64. Young also observed other symptoms consistent with lower back pain including spasm palpated, tenderness, and inability to stand erect. (Young Dep. 87-88, 90; Ex. 14.)

65. Further, Plaintiff represented his pain as a ten on a pain scale of zero to ten, which is the worst pain he has ever had in his life. (Young Dep. 94; Ex. 14.)

66. Plaintiff's x-rays revealed "no acute findings." (Young Dep. 59, 61; Ex. 14.) The radiologist's notes also state "mild degenerative changes, without an acute process. . . ." (Young Dep. 61; Young Dep. Ex. 2, 3.)

67. Plaintiff did not report any other known injury. (Tr. 168-69; Young Dep. 56-57; Ex. 14.)

68. Plaintiff did not tell Young he suffered from back pain prior to his emergency room visit. (Young Dep. 66-67.)

69. Plaintiff testified that he did not tell Young he was kneed in the back because she did not ask him. (Tr. 169.)

70. Young diagnosed Plaintiff as having acute lumbar pain and spasm and gave him discharge instructions. (Ex. 14.)

9

71. Young testified that in her experience, she had previously seen the type of lower back pain experienced by Plaintiff. (Young Dep. 58.) Although she could not always determine the root of the problem, such pain could stem from a variety of causes. (Young Dep. 58-59, 98.)

72. Young stated that after the initial pain from lower back injuries has gone away, it can reoccur through a variety of movements or impacts. (Young Dep. 86.)

73. Young testified that she did not recall examining a patient who reported that more than a week had passed since his or her injury and the onset of pain. (Young Dep. 66.)

74. Young stated that she normally did not provide follow-up care unless a patient returns to the emergency room. (Young Dep. 79.)

75. After Plaintiff's visit to the emergency room, he submitted several medical complaints to the GCDC. On November 16, 2000, Plaintiff submitted a medical complaint stating that his problem started "2 weeks ago." (Tr. 157-58; Ex. 8.) Plaintiff's November 16, 2000 Medical Treatment Report states that he reported to the prison doctor that he "developed back pain while playing cards– acute injury." (Tr. 159-60; Ex. 9.) Plaintiff's December 4, 2000 medical complaint and December 7, 2000 Medical Treatment Report state his problem started "3 weeks ago." (Tr. 160-62; Ex. 10, 11.) Plaintiff's January 3, 2001 medical complaint form lists the development date of his back problem as "1 month ago." (Tr. 163; Ex. 12.) The first time Plaintiff lists October 13, 2001 as the date of his problem is on his January 10, 2001 medical complaint form. (Tr. 164; Ex. 13.)

76. After LeVar stopped representing Plaintiff, Attorney Cynthia Brandon (Brandon) represented Plaintiff in defense of the federal charges pending in the Eastern District of Arkansas. (Tr. 177; Brandon Dep. 8; Ex. 15.)

77. Brandon's first contact with Plaintiff was November 30, 2000. (Brandon Dep. 8.) Her first meeting with Plaintiff was December 11, 2000. (Brandon Dep. 11.)

78. Brandon testified that during her meetings with Plaintiff, she observed him to be in pain; he would also make complaints to her about his back pain. (Brandon Dep. 9-11; see also Tr. 126.)

79. In December 2000, in connection with the federal drug-trafficking charges, Plaintiff met with Brandon and law enforcement authorities in the Garland County Sheriff's Office in Hot Springs, Garland County, Arkansas. (Joint Pretrial Order, Uncontested Facts.)

80. Although other individuals may have been present, Plaintiff, Brandon, and Carlton were present during at least one meeting (Joint Pretrial Order, Uncontested Facts; Tr. 353, 360, 373; Brandon Dep. 17-18.)

81. On December 8, 2000, Plaintiff had a detention hearing before a magistrate judge. (Tr. 198; Ex. 18.) Brandon represented Plaintiff at this hearing. (Ex. 18.) Plaintiff did not advise the Magistrate Judge of the circumstances surrounding his injury. (Tr. 199-200.)

82. Plaintiff was an adult male incarcerated in the custody of the Federal Bureau of Prisons (FBP). (Joint Pretrial Order, Uncontested Facts.)

83. While incarcerated in the FBP, Plaintiff was provided medical care at the FBP's expense. (Joint Pretrial Order, Uncontested Facts.)

84. FBP's medical staff treated Plaintiff for lower back pain on several occasions. (Tr. 127-29; Ex. 1.) In addition, FBP provided Plaintiff with a lower bunk assignment, which is reserved for individuals with back problems, and also prescribed a back brace. (Tr. 129-32.)

85. Prior to October 13, 2000, Plaintiff never experienced pain similar to that which he is

currently experiencing. (Tr. 108-09, 112-13.) Plaintiff continued to experience pain up through and including trial. (Tr. 127-135.)

86. Prior to Plaintiff's October 13, 2000 arrest, he participated in physically demanding activities including various sports, martial arts, and weightlifting. (Tr. 88-90.) Plaintiff also worked as a bouncer and worked in the roofing and concrete industries. (Tr. 91-92.) In addition, Jones testified that prior to Plaintiff's arrest, he had observed Plaintiff engaged in martial arts without complaining of back problems. (Tr. 26-27.)

87. Plaintiff can no longer engage in any of the physical activities discussed above, including certain forms of manual labor requiring heavy lifting, or violent confrontations. (Tr. 133-35.) Further, he cannot sit for long periods of time. (Tr. 132-33.)

88. Plaintiff's weight has increased during the time period between his November 7, 2000 visit to National Park Medical Center's emergency room and the time of trial. (Ex. 1 at 26; Tr. 139.)

89. Plaintiff takes medication for depression and pain relief. (Tr. 131, 136.)

90. On August 11, 2003, Plaintiff timely filed his Complaint. (Joint Pretrial Order, Uncontested Facts.)

### III. CONCLUSIONS OF LAW

#### A. MOTION IN LIMINE TO EXCLUDE INADMISSIBLE HEARSAY EVIDENCE

As a preliminary matter, the Court will first address Defendant's pending Motion in Limine to Exclude Inadmissible Hearsay Evidence (D.E. # 48.) In its motion, Defendant contends that

Carlton's alleged statement, "Yeah, I know my partner gets that way,"[1] Brandon Dep. 19, is an unreliable and inadmissible hearsay statement offered through the testimony of Brandon and/or Plaintiff. In opposition to Defendant's motion, Plaintiff contends that Carlton's alleged statement is admissible as non-hearsay under Fed. R. Evid. 801(d)(2)(D), as a statement of a party's agent made during the scope of his employment.

Brandon testified by deposition that on December 6, 2000,[2] she was at the Garland County Sheriff's Office where Carlton and others were present to interview Plaintiff in connection with the drug charges stemming from Plaintiff's arrest. (Def.'s Mem. in Support of Mot. in Limine 2 (hereinafter Def.'s Mem.); Brandon Dep. 16-18; Ex. 21.) Plaintiff then described how he was injured during his arrest: "Nelson"[3] threw him to the ground, handcuffed him, kneed him in the back, and hit him with a pistol. (Tr. 122; Brandon Dep. 19.) As Plaintiff was describing the circumstances surrounding his lower back injury, Carlton allegedly stated, "Yeah, I know my partner gets that way." (Tr. 122; Brandon Dep. 19.) Brandon further testified that at Plaintiff's insistence, she made a note of Carlton's comment. (Tr. 122-25; Brandon Dep. 19-23; Ex. 21, 25.) Carlton denied making the statement. (Tr. 353-54, 375.)

At issue is whether Carlton's alleged statement qualifies as a non-hearsay statement under Fed. R. Evid. 801(d)(2)(D). Specifically, the parties disagree as to whether the statement relates to a matter within the scope of the agency or employment for the purposes of Fed. R. Evid.

---

[1] Brandon also reported the alleged statement in her affidavit as, "Yeah my partner, Nelson, gets that way sometimes." (Ex. 25.)

[2] Brandon lists the date of the meeting as December 1, 2000 in her affidavit. (Ex. 25)

[3] There is no individual by the name of "Nelson" involved in this case. Based on the record as a whole, the Court concludes that Plaintiff was referring to Newman, the agent who arrested Plaintiff.

801(d)(2)(D).[4]  Fed. R. Evid. 801(d)(2)(D) states in part, "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . ."  In order to qualify as an admission under 801(d)(2)(D), "[t]he only requirement is that the subject matter of the admission match the subject matter of the employee's job description."  Aliotta v. Nat'l R.R. Passenger Corp., 315 F.3d 756, 762 (7th Cir. 2003).  In the context of tort claims, "an employee need only be performing the duties of his employment when he comes in contact with the particular facts at issue." Id. (citing Poltec v. Nw. Airlines, 86 F.3d 498, 536 (6th Cir. 1996) (vice president's statements regarding investigation of accident scene qualify as admissions under 801(d)(2)(D) because investigation was conducted as a part of his duties)).

In this case, Carlton's alleged statement was made within the scope of his employment.  Carlton was present is his capacity as a law enforcement officer when Newman arrested Plaintiff in October 2000.  Carlton's December 2000 interview of Plaintiff, during which Carlton made the alleged statement, was also conducted within the scope of his duties as an ATF agent.  Thus, Carlton learned of the circumstances surrounding Plaintiff's arrest while performing the duties of his employment.  The Court finds Defendant's arguments to the contrary unpersuasive.  Courts have distinguished the employment discrimination cases relied upon by Defendant from cases in other contexts.  See id. (while decision-making authority may be important in employment cases, "no similar requirement exists in other contexts"); Weinstein's Federal Evidence § 801.33[2][c] (Joseph M. McLaughlin et al. eds., 2d ed. 2007).  Further, because the present case is a bench trial, there is

---

[4]Defendant acknowledges that Carlton "fits the definition of an 'agent or servant' of the United States and that the alleged statement was made during the existence of the relationship with ATF."  (Def.'s Mem. 4.)

14

no danger that the statement would prejudice or confuse the trier of fact. Because Carlton's alleged statement falls within the scope of the agency or employment context, the Court finds that it is non-hearsay under 801(d)(2)(D). Thus, the Court will consider Carlton's alleged statement in the context of the other evidence presented in this case. Therefore, Defendant's motion in limine is **DENIED**.

Because the Court has decided Defendant's motion on the grounds discussed above, it finds it unnecessary to address Defendant's arguments as to the inapplicability of the residual exception pursuant to Fed. R. Evid. 807.

**B.     ASSAULT AND BATTERY**

Turning now to Plaintiff's substantive claims, the Court has jurisdiction over this matter pursuant to the FTCA and 28 U.S.C. § 1346(b).[5] See, e.g., Flechsig v. U.S., 991 F.2d 300, 302 (6th Cir. 1993) ("The FTCA constitutes a limited waiver of sovereign immunity by the United States . . . . [T]hus . . . the FTCA defines the scope of district court jurisdiction to entertain FTCA suits."). The FTCA provides that, "with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of [the FTCA] shall apply to any claim arising . . . out of" certain torts, including assault and battery.[6] 28 U.S.C. § 2680(h). "The liability

---

[5]28 U.S.C. § 1346(b)(1) provides that:

the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

[6]An investigative or law enforcement officer "means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). As ATF agents, Carlton and Newman would fall under this definition.

of the United States in actions under the Federal Tort Claims Act is governed by the law of the place where the alleged tort occurred." Ward v. U.S., 838 F.2d 182, 184 (6th Cir. 1988); see also 28 U.S.C. § 1346(b)(1). All of the acts underlying this case occurred in Arkansas. Therefore, Arkansas state law applies to Plaintiff's claims.

At issue is whether Defendant, by and through its agent, Newman, committed assault and battery upon Plaintiff's person. Generally, battery is defined as "a wrongful or offensive physical contact with another through intentional contact by the tortfeasor and without consent of the victim, the unpermitted application of trauma by one person upon the body of another person." Costner v. Adams, 121 S.W.3d 164, 170 (Ark. Ct. App. 2003) (citing 6 Am. Jur. 2d Assault and Battery § 3 (1999)). Assault is generally "defined as an intentional attempt by a person, by force or violence, to do an injury to the person of another, or as any attempt to commit a battery, or any threatening gesture showing in itself or by words accompanying it an immediate intention, coupled with a present ability, to commit a battery." Id. (citing 6 Am. Jur. 2d Assault and Battery § 1 (1999)). However, "[a] law enforcement officer is justified in using nondeadly physical force or threatening to use deadly physical force upon another person if the law enforcement officer reasonably believes that use of . . . force is necessary to: (1) Effect an arrest . . . ." Ark. Code Ann. § 5-2-610(a)(1) (2007).

In this case, Plaintiff alleges that while Newman was arresting him, Newman committed assault and battery upon Plaintiff by dropping down forcefully on Plaintiff's back with his knee. As a result, Plaintiff contends that he has experienced severe pain and suffered a serious bodily injury. In contrast, Defendant denies Plaintiff's allegations.

As the trier of fact in a bench trial, the Court must evaluate the credibility of witnesses and

weigh the evidence. Based on a review of the evidence as a whole, the Court finds that although Plaintiff has presented sufficient evidence of the existence of his back injury, he has failed to present persuasive evidence that Defendant, through Newman, caused his injury. Thus, Plaintiff has failed to establish the causal connection.

When a cause of action is based in tort, there must be sufficient proof of causation. Hill v. Maxwell, 448 S.W.2d 9, 10 (Ark. 1969).

> However it is not necessary that the plaintiff [negate] entirely the possibility that the defendant's conduct was not a cause. It is enough that the plaintiff introduce evidence from which [a] reasonable [person] may conclude that it is more probable that the event was caused by the defendant than that it was not.

Id. at 10-11. Plaintiff, in addition to his own testimony, relied primarily on the testimony of Jones and Brandon in an attempt to establish that Newman committed an assault and battery upon him by kneeing him in the back and striking him with a pistol. However, this evidence is outweighed by other evidence to the contrary.

Specifically, the medical evidence presented at trial did not establish a causal relationship between Newman's alleged conduct and any subsequent back problems experienced by Plaintiff. Plaintiff did not report an injury at the time he was booked-in and processed on October 13, 2000. The first medical record documenting Plaintiff's back injury was generated on November 7, 2000 when Plaintiff was transported to National Park Medical Center's emergency room, approximately three weeks after his arrest. According to Young's testimony and records, Plaintiff complained of a sudden onset of lower back pain the prior evening. Even assuming Plaintiff understood "onset" as referring to the pain he was currently experiencing, Plaintiff failed to report any other known injury. A reasonable person in Plaintiff situation would have reported Newman's alleged actions to his treating physician or other medical personnel at the earliest practicable opportunity.

17

Subsequent medical complaint forms are consistent with Plaintiff's initial claims that the onset of his pain was November 6, 2000. Plaintiff did not report October 13, 2000, the date of his arrest, as the onset of his pain until his January 10, 2001 medical complaint form. Moreover, Plaintiff's other behavior is also inconsistent with his suffering an injury on October 13, 2000: Plaintiff failed to inform his first two attorneys, Eddy and LeVar, or the Magistrate Judge of Newman's alleged actions or of his injury. Further, although Brandon's testimony purports to establish that Plaintiff complained to her about his injuries, Brandon did not start representing Plaintiff until after his November 7, 2000 visit to the emergency room. Moreover, the Court does not find Carlton's statement, "Yeah, I know my partner gets that way," to be dispositive as to the cause of Plaintiff's back injury. Even assuming Carlton made this statement, the Court finds that in light of the other evidence presented, this statement is nonetheless insufficient to sustain Plaintiff's burden of proving that Defendant, through Newman, committed assault and battery. Furthermore, this statement is speculative in nature because Carlton did not observe the entire arrest as it transpired, and no one testified seeing Newman knee or strike Plaintiff. Finally, the sum of Newman's, Carlton's, Scotty Dodd's, and Keck's testimony tend to establish that Newman did not knee Plaintiff in the back or strike him with a pistol during Plaintiff's arrest.

Therefore, the Court concludes that Plaintiff failed to prove by a preponderance of the evidence that Defendant, through Newman, committed assault and battery upon Plaintiff.

**C.   NEGLIGENCE**

Plaintiff claims that Carlton, as Newman's supervisor, negligently failed to intervene or prevent Newman from inflicting injury upon Plaintiff. As discussed in Part III.B., Plaintiff has failed to present sufficient evidence that Newman committed assault and battery upon Plaintiff.

18

Therefore, the Court concludes that Plaintiff has failed to prove by a preponderance of the evidence that Carlton was negligent.

## D.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff also brings a claim for IIED. The FTCA does not bar suits against the United States for IIED. See, e.g., 28 U.S.C. § 2680(h) (IIED not listed as an exception to the FTCA); Sheehan v. U.S., 896 F.2d 1168, 1172 (9th Cir. 1990); Gross v. U.S., 676 F.2d 295, 304 (8th Cir. 1982). Under Arkansas law, the elements of IIED[7] are:

> (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community;" (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could expect to endure it.

Faulkner v. Ark. Children's Hosp., 69 S.W.3d 393, 403-04 (Ark. 2002). The Arkansas Supreme Court "has taken a very narrow view of claims of outrage." Id. at 404. In addition, "the tort of outrage is not easily established and requires clear-cut proof; merely describing the conduct as outrageous does not make it so." Ross, 817 S.W.2d at 420.

In viewing the facts of this case, Plaintiff has failed to present sufficient evidence to satisfy the elements of IIED. Plaintiff's IIED claim is premised upon Newman's alleged conduct during Plaintiff's arrest. However, as discussed in Part III.B., the Court found that Plaintiff did not show by a preponderance of the evidence that Newman kneed him in the back or struck him with a pistol. Further, Plaintiff's evidence that he is currently taking antidepressant medication is alone insufficient to prove that he currently suffers from the level of emotional distress required for an

---

[7]IIED is also referred to as the tort of outrage. Ross v. Patterson, 817 S.W.2d 418, 420 (Ark. 1991).

IIED claim. Therefore, the Court concludes that Plaintiff has failed to prove by a preponderance of the evidence that Defendant committed the tort of IIED.

**E.     DAMAGES**

Because the Court finds that Defendant is not liable to Plaintiff under the FTCA, it does not reach the issue of damages.

**IV.    CONCLUSION**

Based on the foregoing, the Court finds that Defendant is absolved from all liability. Judgment is entered for Defendant and Plaintiff's Complaint is dismissed.

**IT IS SO ORDERED** this 14th day of January, 2008.

>                              s/Bernice Bouie Donald
>                              BERNICE BOUIE DONALD
>                              UNITED STATES DISTRICT COURT JUDGE